IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY,<br><br>            Plaintiff,<br><br><br>      vs.<br><br><br>WOODSIDE HOMES CORPORATION, KATHLEEN CLARK, ALI S. YAZD, PARVIN YOUSEFI, WILMA PARKINSON,<br><br>      Defendants. | ORDER AND MEMORANDUM DECISION<br><br><br><br>Case No. 1:02 CV 161 |

Great American Insurance Co. filed this lawsuit seeking a declaration that it has no duty to defend or otherwise provide coverage to its insured, Woodside Homes Corp., in relation to three state lawsuits that involve allegations of defective home construction.  Woodside filed a counterclaim, arguing that Great American breached the insurance contract, or alternatively, that the contract should be reformed to provide Woodside coverage for the state claims. Additionally, Woodside named an insurance broker, The Buckner Group, as a third-party defendant, claiming that if Great American prevails in this action, The Buckner Group is liable to Woodside for failing to procure requested insurance coverage.

Woodside and Great American have filed cross motions for summary judgment, each claiming that the plain language of the insurance contract supports their respective position concerning whether the claims alleged in the state suits are covered by the policy.  Woodside

additionally contends that the operative contractual language is, at best, ambiguous and that the court should look beyond the four corners of the contract to discern the parties' intent.  Also pending are cross motions for summary judgment addressing the potential liability of The Buckner Group.  Woodside concedes, however, that any liability on the part of The Buckner Group is dependant on a finding that no coverage under the insurance contract exists.

### Background

Woodside develops single-family homes in multiple states.  Almost all of the construction work on these homes is performed by subcontractors working on Woodside's behalf.  Because Woodside relies heavily on subcontractors, it attempts to secure insurance that provides coverage for damage caused by or arising out of the completed work of its subcontractors.

Woodside and The Buckner Group claim that they were previously able to secure such coverage from Travelers Indemnity Co.  But when they could no longer obtain coverage from Travelers, The Buckner Group and Woodside began to explore the possibility of obtaining coverage from Great American.  The Buckner Group served as an intermediary between Woodside and Great American while the sides negotiated the issuance of an insurance policy.  Ultimately, Great American agreed to issue a general commercial liability policy to Woodside and the parties maintained their relationship for many years.[1]

The present dispute arose after Woodside was named as a defendant in three separate civil actions: (1) Clark v. Woodside Homes Corp., Weber County Second District Court Civil

---

[1]Great American issued the following polices naming Woodside as an insured: Policy No. PAC 914-78-17-01, effective December 12, 1996, through December 12, 1997; Policy No. PAC 914-78-17-02, effective December 12, 1997, through December 12, 1998; Policy No. PAC 914-78-17-03, effective December 12, 1998, through December 12, 1999; Policy No. PAC 914-78-17-04, effective December 12, 1999, through December 12, 2000; Policy No. PAC 914-78-17-05, effective December 12, 2000, through December 12, 2001.

No. 020901788 (the "Clark action"); (2) <u>Yazd v. Woodside Homes Corp.</u>, Utah County Fourth

District Court Civil No. 020402197 (the "Yazd action"); and (3) <u>Parkinson v. Woodside Homes</u>

<u>Corp.</u>, Utah County Fourth District Court Civil No. 030400017 (the "Parkinson action")

(collectively, the "underlying actions").  Each of the underlying actions involve allegations of

defective home construction, although the specific causes of action vary.

      After becoming aware of the claims, Woodside tendered its defense to Great American,

citing the relevant commercial general liability policies.  Great American rejected each of

Woodside's tenders and denied coverage.  Great American then filed this suit seeking a

declaration of its duties under the liability policies.

<u>**Legal Standard Governing Summary Judgment**</u>

      Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c);  <u>see</u> <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986); <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670

(10th Cir. 1998).  The court must "examine the factual record and reasonable inferences

therefrom in the light most favorable to the party opposing summary judgment."  <u>Applied</u>

<u>Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990).  "The

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient

[to overcome a motion for summary judgment]; there must be evidence on which the jury could

reasonably find for the plaintiff."  <u>Liberty Lobby</u>, 477 U.S. at 252; <u>see also</u> <u>Anderson v. Coors</u>

<u>Brewing Co.</u>, 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the

nonmoving party's theory does not create a genuine issue of material fact.").

3

<u>**Analysis**</u>

The manner in which the dispute between Great American and Woodside is resolved could have a potentially disposttive effect on the cross motions for summary judgment addressing the possible liability of The Buckner Group.  Accordingly, the court will address Great American's obligations under the insurance polices before turning to Woodside's claims against The Buckner Group.

**I.  Obligations and Duties Under the Insurance Policies**

An insurance company's duty to defend is broader than its duty to indemnify.  <u>Deseret Fed. Sav. & Loan Ass'n v. United States Fidelity & Guar. Co.</u>, 714 P.2d 1143, 1146 (Utah 1986). If the duty to defend attaches to any claim alleged in a complaint, the insurer is obligated to undertake the defense of its insured for all claims raised in the complaint.  <u>See</u> <u>Overthrust Constructors, Inc. v. Home Ins. Co.</u>, 676 F. Supp. 1086, 1091 (D. Utah 1987) ("Once an insurer has a duty to defend an insured under one claim brought against the insured, the insurer must defend all claims brought at the same time, even if some of the claims are not covered by the policy."); <u>accord</u> <u>West Am. Ins. Co. v. AV&S</u>, 145 F.3d 1224, 1230 (10th Cir. 1998).

"An insurer's duty to defend is determined by reference to the allegations in the underlying complaint.  When those allegations, if proved, could result in liability under the policy, then the insurer has a duty to defend."  <u>Nova Casualty Co. v. Able Constr., Inc.</u>, 1999 UT 69, ¶ 8, 983 P.2d 575.  Accordingly, to resolve the parties present dispute, a review of the allegations in the underlying actions is necessary.

<u>A.  The Underlying Actions</u>

  *1. The Clark Action*

The complaint in the Clark action fails to expressly allege any specific cause of action.  It

4

alleges that the home the Clarks purchased from Woodside is practically uninhabitable due to "structural decay and damage, walls splitting, floors cracking, driveway sliding, and many other problems to[o] numerous to mention." (Amended Complaint ¶ 5, attached as Ex. 6 to Aff. of Glen Ison, Feb. 15, 2006 (dkt. #156-1) ("Ison Aff.").) The Clarks allege on information and belief that the problems with the residence were the result of the builders' failure to adequately account for water run-off. (See id. ¶ 7.)

In their prayer for relief, the Clarks request that "[t]he Court find that the Defendants have breached their written and verbal contracts and agreements with the Plaintiffs and that the home is substandard or uninhabitable; therefore, the home needs to be replaced and/or repaired in great detail." (Id. 2-3.)

2. *The Yazd Action*

The complaint in the Yazd action alleges that the house the plaintiffs purchased from Woodside quickly developed "cracks in the foundation[,] . . .the basement floor and the driveway." (Complaint ¶ 10, attached as Ex. 7 to Ison Aff.) Additionally, the plaintiffs allege that "[d]oors throughout the House ha[ve] shifted and [are] hard to open and close." (Id.) The plaintiffs claim that they are entitled to recover damages from Woodside, expressly stating the following claims: (1) Fraudulent Concealment, (2) Fraudulent Nondisclosure, (3) Breach of Warranty, (4) Mutual Mistake, and (5) Unilateral Mistake. (See id. at 6-11.)

The first two causes of action in the Yazd action allege wrongdoing on the part of Woodside itself and not its subcontractors. (See id. at 6-8.) Specifically, the complaint states that Woodside was aware of troublesome soil conditions and neglected to inform the home buyers. (See id.) The third cause of action expressly refers to the written contract entered into between the parties and alleges a breach of that contract. (See id. at 8.) Causes of action four

and five address the assumed quality of the home.  (See id. at 9-11.)  In the fourth cause of action, the plaintiffs claim mutual mistake, asserting that the parties mistakenly believed that the home was of the requisite quality at the time of its completion.  (See id. at 9.)  In the fifth cause of action, plaintiffs allege that they mistakenly accepted the house at the time of its completion because no construction defects were apparent at that time.  (See id. at 10-11.)

     *3.*      *The Parkinson Action*

The complaint in the Parkinson action alleges two causes of action against Woodside: (1) Fraudulent Nondisclosure, and (2) Fraudulent Concealment.  (Complaint 4-5, attached as Ex. 8 to Ison Aff.)  The plaintiffs allege that the foundation of the home they purchased from Woodside began cracking within a year from the date of sale.  (See id. ¶ 8.)  The plaintiffs' claims are confined to allegations that Woodside had knowledge of a troublesome soil report and failed to inform the plaintiffs about that report.  (See id. at 2-4.)

## B.  The Insurance Contract

Having described the nature of the allegations in the underlying actions, it is now necessary to compare those allegations with the coverage provided by the insurance policy[2] to determine if Great American's duty to defend is triggered by the underlying complaints.

---

[2]Although Great American issued several policies to Woodside, the provisions relevant to the current action remained virtually unchanged from year to year.  For ease of discussion, the court simply discusses the language of "the policy" without making a distinction between policy years.  One notable distinction, however, is that the policies in effect from 1998 to 2001 contained an expanded definition of the term "occurrence."  During those years, the policies defined an "occurrence" as

> [a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in bodily injury or property damage which first manifests on or after the inception of this policy period, as shown in the Declarations Page of the policy but prior to the earlier of the date of expiration or cancellation of this policy.

(Endorsement CG 82 10, attached as Ex. O to Aff. of Matthew L. Cookson (dkt. #152).  Regardless of the definition of "occurrence" considered in analyzing the parties' claims, the outcome is the same.

The critical policy language appears in a form created and copyrighted by the Insurance Services Office, Inc. ("ISO") and which Great American and Woodside adopted without alteration. The insuring agreement contained in the policy provides that Great American will

> pay those sums that the insured becomes obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any suit seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(Commercial General Liability Coverage Form ("CGL") 1, attached as Ex. B to Memo. in Supp. of Third-Party The Buckner Group's Mot. for Summ. J. (dkt. #141).) The policy then provides that coverage will be provided only if "the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" (Id.) The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 14.)

Woodside argues that the property damage claimed in the underlying actions resulted from faulty work performed by its subcontractors. According to Woodside, that faulty work constitutes an occurrence triggering coverage. Great American responds by arguing that faulty work performed by subcontractors is not an "accident" under Utah law and is therefore not an "occurrence" under the insurance policy.

In support of its position, Great American relies on H.E. Davis & Sons, Inc. v. North Pacific Insurance Co., 248 F. Supp. 2d 1079 (D. Utah 2002). In that case, the court held that Utah law does not consider negligent work performed by an insured to be an occurrence because the consequences of negligent work are reasonably foreseeable and therefore no "accident" resulting from that work can occur. Id. at 1084 ("Plaintiff failed to adequately compact the soil,

7

with natural and foreseeable results.  So long as the consequences of plaintiff's work were natural, expected, or intended, they cannot be considered an 'accident[.]'").  But while H.E. Davis directly answers the question of whether an insured's negligent work can be considered an accident under a commercial general liability policy, that case does not address the question here: whether faulty work performed by an insured's subcontractor can be considered an accident, and therefore an occurrence.

Courts that have addressed the question of whether deficient subcontractor work should be considered an occurrence under a general contractors insurance policy have reached different results.  For example, in Nabholz Construction Corp. v. St. Paul Fire & Marine Insurance Co., 354 F. Supp. 2d 917 (E.D. Arkansas 2005), the court held that the faulty work of a subcontractor should not be considered an occurrence because the faulty work is not an accident from the standpoint of the general contractor.  Id. at 921.  In that case, "[t]he Court agree[d] that a contractor's obligation to repair or replace its subcontractor's defective workmanship should not be deemed 'unexpected' on the part of the contractor, and therefore, fails to constitute an 'event' for which coverage exists."  Id.

The court in Nabholz also expressed its opinion that reaching a contrary result would inadvisably convert a commercial general liability policy into a performance bond.  See id. at 922 ("The purpose of a CGL policy is to protect an insured from bearing financial responsibility for unexpected and accidental damage to people or property.  It is not intended to substitute for a contractor's performance bond, the purchase of which is to insure the contractor against claims for the cost of repair or replacement of faulty work."); see also Bituminous Cas. Corp. v. R.C. Altman Builders, Inc., No. 2:01-4267-DCN, 2006 WL 2137233, at *4 (D.S.C. July 28, 2006) ("Finding coverage would penalize the general contractor's carrier rather than the negligent

party, the subcontractor.  Further, affording coverage to a general contractor for damage to a

residence stemming from its subcontractor's defective work would not encourage general

contractors to more carefully select their subcontractors.").

       In contrast, the court in <u>Archon Invs., Inc. v. Great Am. Lloyds Ins. Co.</u>, 174 S.W.3d 334

(Tx. Ct. App. 2005), concluded that faulty work performed by subcontractors is properly

considered an occurrence under a commercial general liability policy.  <u>See id.</u> at 340 ("Because

Archon could not have intended that the negligent work of its subcontractors cause physical

damage to Braden's home, damage to Braden's property due to the negligence of Archon's

subcontractors falls within the scope of an occurrence under the language of the CGL policy . . .

."); <u>see also</u> <u>Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.</u>, 137 P.3d 486, 495 (Kan. 2006)

("The damage in the present case is an occurrence . . . because the faulty materials and

workmanship provided by Lee's subcontractors caused continuous exposure . . . to moisture.

The moisture in turn caused damage that was both unforseen and unintended.").

       While a review of case law from other jurisdictions that addresses this topic is helpful, the

resolution of this case requires an analysis of Utah law.  <u>See Lee Builders</u>, 137 P.3d at 491 ("Our

obligation . . . is not to address all the arguments and other holdings from all the other

jurisdictions or to analyze all the competing expert commentary on the subject.  Rather, our task

is to decide the question of 'occurrence' in this case based upon Kansas law, to the extent

possible.").

       In Utah, whether an "accident" has occurred is determined from the viewpoint of the

insured, not the actor causing injury.  <u>See</u> <u>Hoffman v. Life Ins. Co. of N.A.</u>, 669 P.2d 410, 416

(Utah 1983) ("[A] person is a victim of an accident when, from the victim's point of view, the

occurrence causing the injury or death is not a <u>natural and probable</u> result of the victim's own

acts."); <u>Archon Invs., Inc.</u>, 174 S.W.3d at 340 ("The insured's standpoint controls in determining whether there has been an 'occurrence' that triggers the duty to defend.").

As discussed, Utah case law indicates that an insured's own faulty or negligent work is not fairly characterized as an occurrence under a commercial general liability policy.  <u>See, e.g.</u>, <u>H.E. Davis</u>, 248 F. Supp. 2d at 1084.  But it appears that no court has yet applied Utah law to the exact situation presented here: whether faulty work by a subcontractor is an occurrence from the standpoint of an insured employing that subcontractor.  The Utah Supreme Court's holding in <u>Hoffman,</u> though not dealing with construction liability, is nevertheless instructive.  In <u>Hoffman</u>, the court held that "a person is a victim of an accident when, from the victim's point of view, the occurrence causing the injury . . . is not a <u>natural and probable result</u> of the <u>victim's own acts</u>." <u>Id.</u> at 416 (first emphasis in original, second emphasis added).  Given the Utah Supreme Court's focus on the acts of the insured when determining whether there has been an occurrence, it follows that the negligent acts of Woodside's subcontractors can be considered an occurrence from Woodside's "point of view," <u>id.</u>; <u>cf.</u> <u>O'shaughnessy v. Smuckler Corp.</u>, 543 N.W.2d 99, 103 (Minn. Ct. App. 1996) ("A general contractor has minimal control over the work of its subcontractors by definition.").

Great American seeks to avoid this result by arguing that a commercial general liability policy is not intended to be a performance bond and that policy considerations weigh against providing coverage in the context presented by this case.  The court in <u>Bituminous</u> cited such concerns in determining that faulty subcontractor work should not be considered an occurrence. <u>See</u> 2006 WL 2137233, at *4.  But "the fact that the general contractor receives coverage will not relieve the subcontractor of ultimate liability for unworkmanlike or defective work.  In such a case, an insurer will have subrogation rights against the subcontractor who performed the

defective work." O'Shaughnessy, 543 N.W.2d at 103.  Further, while disallowing coverage for faulty subcontractor work would arguably increase the level of care general contractors take when selecting subcontractors, there are several other practical factors that already serve this function.  A general contractor's concern about business reputation and the understandable desire to avoid time consuming repair work--regardless of whether the general contractor must foot the bill for such work--are two such factors that are readily apparent.

Further, the conclusion that defective subcontractor work can be considered an occurrence harmonizes other provisions contained in the policy that might otherwise be in tension.  "An insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts."  Alf v. State Farm Fire & Cas. Co., 850 P.2d 1272, 1274 (Utah 1993).  When interpreting a contract, "a court must attempt to construe the contract so as to harmonize and give effect to all of its provisions."  Green River Canal Co. v. Thayne, 2003 UT 50, ¶ 31, 84 P.3d 1134 (internal quotation and brackets omitted).

Here, the policy excludes coverage for "'[p]roperty damage to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" (CGL 4.)  The policy goes on to provide that "[t]his exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."  (Id.)  In Lee Builders, the court commented that this exclusionary language--and the exception to that exclusion--supports the determination that defective subcontractor work is covered under policies like that at issue here. 137 P.3d at 493-94.  In Lee Builders, the court approved the analysis of the exclusionary language previously undertaken by the Kansas Court of Appeals.  See id. Specifically, the Kansas Supreme Court agreed that if the term "occurrence" is given a narrow construction, the subcontractor exception to the "your work" exclusion "would be rendered

11

meaningless." Id. at 494 (internal quotation omitted).

Great American argues that at least one commentator has managed to articulate a situation in which the subcontractor exception would operate even when the term "occurrence" is given the narrow construction that it urges in this case. See Christopher Burke, "Exposing the Faulty Premise--The Insurer's Interpretation of 'Occurrence' Does Not Render the Subcontractor Exception to the 'Your Work' Exclusion Meaningless," Mealey's Litigation Report: Construction Defects Insurance, vol 2, no. 11, pg. 21 (Dec. 2005). The two examples there "deal with the situation when work or operations performed pursuant to one contract cause damage to work performed under a separate contract." See id. at 24-25 (giving examples involving the construction of two neighboring homes and a townhouse). Despite the two admittedly plausible situations described in commentary, it is undeniable that excluding faulty subcontractor work from the definition of "occurrence" would reduce the operation of the subcontractor exception so drastically that the language would virtually cease to be of any meaningful effect.

Additionally, although the court rests its conclusion on the language of the policy itself[3], the interpretation put forward by Woodside comports with the drafting history of the commercial general liability policy form used by Great American. See 9A Couch on Ins. § 129.18 ("Due to the increasing use of subcontractors on construction projects, many general contractors were not satisfied with the lack of coverage provided under commercial general liability policies where the

---

[3]Great American has filed a motion to strike all evidence submitted by Woodside and The Buckner Group that purports to shed light on the proper interpretation of the insurance agreement. Great American argues that the consideration of such evidence is impermissible absent a finding that the insurance contract is ambiguous. As noted by the Tenth Circuit in Flying J., Inc. v. Comdata Network, Inc., 405 F.3d 821 (10th Cir. 2005), there is an apparent conflict in Utah case law concerning whether extrinsic evidence may be considered by the court when determining whether a contract is ambiguous. See id. at 831-32. Because the court rests its decision on the language contained within the four corners of the contract, there is no need to address this apparent conflict and Great American's motion is moot.

general contractor was not directly responsible for the defective work.  In 1976 the insurance

industry responded by the introduction of the Broad Form Property Damage Endorsement, which

extended coverage to insureds for property damage caused by the work of their subcontractors.

[The endorsement] was added directly to the body of the policy in 1986."); see also "Broad Form

Property Damage Coverage Explained," Insurance Services Office, Jan. 29, 1979 (explaining the

broad form property damage coverage extends previously existing coverage by "modify[ing] the

application of the property damage exclusion")

Certainly, different jurisdictions have approached and answered the question presented in

this case in various ways.  But the better-reasoned approach, and the approach that is most

consistent with Utah law, views faulty subcontractor work as an occurrence from the standpoint

of the insured.  Nevertheless, the allegations contained in the underlying actions are not entirely

confined to allegations of defective subcontractor work.  Accordingly, a comparison between the

complaints in the underlying actions and the coverage provided by the commercial general

liability policy is necessary.

C.  Comparison Between the Insurance Agreement and the Underlying Complaints

   1.   The Parkinson Action Alleges Only Intentional Wrongdoing on the Part of
        Woodside

Great American argues that any claims of fraudulent concealment or fraudulent

misrepresentation are outside the scope of the insurance agreement because they involve

allegations of intentional conduct on the part of Woodside itself and therefore do not involve an

"occurrence" under the policy.  Because the Parkinson action alleges only nondisclosure on the

part of Woodside, Great American argues that coverage cannot be triggered and therefore it has

no duty to defend Woodside in that action.  Utah case law supports Great American's argument.

13

Nova Casualty, 1999 UT 69, is particularly instructive here.  That case involved a situation where developers allegedly informed home buyers that restrictive covenants previously placed on the property would not prevent the home buyers from running a psychotherapy business in the home.  Id. ¶¶ 3-4.  According to the home buyers, that representation was false. Id. ¶ 4.  Citing the restrictive covenants, the subdivision sued the home buyers and compelled them to shut down their business.  See id. ¶ 3.  The home buyers then sued the developers, who, in turn, tendered the suit to their insurance provider.  Id. ¶ 5.  The insurance company refused to defend the developers and the Nova Casualty litigation followed.

The Utah Supreme Court concluded that the insurance company was not obligated to defend the developers because the complaint alleged an intentional act on the part of the developers themselves.  The court stated that "it appears that the closing down of the . . . business was the natural and probable consequence of [the developers'] representations and that it was very likely such result would occur if its representations were to be untrue, as they seem to have been."  Id. ¶ 15 (internal quotation and quotation marks omitted).  The court then noted that other jurisdictions had similarly concluded that intentional misrepresentations cannot properly be considered an "occurrence" under an insurance policy.  See id. ¶ 14 (citing Safeco Ins. Co. v. Andrews, 915 F.2d 500, 502 (9th Cir. 1990) (misrepresentations are not an occurrence under an insurance policy); Dykstra v. Foremost Ins. Co., 17 Cal.Rptr.2d 543, 545 (intentional or fraudulent acts are purposeful rather than accidental and are therefore not a covered occurrence); M.L. Foss, Inc. v. Liberty Mut. Ins. Co., 885 P.2d 284, 285 (Colo. Ct. App. 1994) (misrepresentations are not an occurrence under an insurance policy); First Wyoming Bank v. Continental Ins. Co., 860 P.2d 1094, 1100 (Wyo. 1993) (no duty to defend against claims that insured made misrepresentations)).

14

Green v. State Farm Fire & Casualty Co., 2005 UT App 564, 127 P.3d 1279, is similarly instructive.  In that case, developers sought insurance coverage against claims brought by a purchaser of a home who asserted that the developers intentionally or negligently failed to disclose material information and breached an implied warranty.  Id. ¶ 7.  Specifically, the home buyer alleged that the developers were aware of, but did not disclose, a report issued by a soils engineer that discussed the risk of a landslide in the area.  See id. ¶¶ 3, 7.  A landslide did occur several years after the developers sold the home.  See id. ¶¶ 2, 5.

The Utah Court of Appeals concluded that the allegations in the underlying complaint did not give rise to a duty to defend.  The court reasoned that

> [t]he essence of Fennell's complaint is that he was damaged by Green's failure to disclose.  However, it must be conceded that Fennell does not claim that any failure to disclose caused the landslide.  Further, we have already concluded that a failure to disclose, whether intentional or negligent, is not an 'occurrence' under the Policy.  Coverage cannot be restored by characterizing the landslide as an 'accident' and therefore, an 'occurrence' under the Policy, when the landslide did not result from the failure to disclose, but from other causes.

Id. ¶ 30.

Under the rationale of Nova Casualty and Green, the allegations in the Parkinson action cannot result in insurance coverage because the claims in that case are confined to fraudulent and negligent nondisclosure.  Even though the home in the Parkinson action may have suffered damage flowing from faulty construction, the complaint in the Parkinson action, like the situation in Green, seeks recovery for damage caused by nondisclosure, not damage caused by faulty construction.

>    2.    *The Yazd Complaint Contains Allegations that Could Trigger Coverage and the Duty to Defend Therefore Applies*

As already discussed, the complaint in the Yazd action alleges: (1) fraudulent

15

concealment, (2) fraudulent nondisclosure, (3) breach of warranty, (4) mutual mistake, and (5) unilateral mistake.  While the fraudulent concealment and fraudulent nondisclosure claims do not trigger Great American's duty to defend for the same reasons applicable to the Parkinson action, the other claims in the Yazd action warrant analysis.

Great American claims that the breach of warranty claim in the Yazd complaint does not trigger the duty to defend because it is a contract claim to which the insurance policy is inapplicable.  Great American rests this assertion on language in the insuring provisions of the policy that limits coverage to damages the insured is "legally obligated to pay" and "liability imposed by law."  (CGL 1.)  Great American contends that this language confines coverage to liability arising from tort actions.  Great American cites VBF, Inc. v. Chubb Group of Insurance Cos., 263 F.3d 1226 (10th Cir. 2001), in support of this proposition.  In VBF, the Tenth Circuit, applying Oklahoma law, concluded that "[t]he phrases 'legally obligated to pay' and 'liability imposed by law' refer only to tort claims and not contract claims."  Id. at 1231 (citing Natol Petroleum Corp. v. Aetna Ins. Co., 466 F.2d 38, 39-42 (10th Cir. 1972); Action Ads, Inc. v. Great Am. Ins. Co., 685 P.2d 42, 42-45 (Wyo. 1984); Lee. R. Russ & Thomas F. Segalla, 7 Couch on Insurance § 103:14 (3d ed. 2000)).

While VBF appears categorical in its statement that the insuring language here imposes liability on the insurer only to the extent a tort claim is pursued against the insured, other authority does not make such a clear distinction.  See, e.g., Malecki & Flitner, Commercial General Liability 6 (6th ed. 1997) ("The expression 'legally obligated' connotes legal responsibility that is broad in scope.  It is directed at civil liability [that] can arise from either unintentional tort, under common law, statute or contract."); 9 Couch on Insurance § 126:3 (3d ed. 1997) ("Whether a particular legal claim falls within the coverage afforded by a liability

policy is not affected by the form of the legal proceeding.  Accordingly, the legal theory asserted

by the claimant is immaterial to the determination of whether the risk is covered.").  In fact, the

case law indicates that the distinction drawn between claims for tort and contract recovery has

typically been used as a shorthand method for determining whether the event underlying the

damage was caused by an occurrence the policy was meant to cover.  See Natol Petroleum, 466

F.2d at 42 ("[T]he phrase of liability 'imposed by law' describe[s] the 'the kind of liability'

which the insurer agreed to insure against.").  As a result, while the distinction between contract

and tort liability may serve as a useful general rule, coverage will turn on the insuring agreement

itself and the particular form of a claim will not govern the issue of coverage.  See 2 Insurance

Claims & Disputes 4th § 11:7 ("Could an insurer successfully argue that [breach of warranty]

claims are not covered because a breach of warranty claim is a type of contract claim?  The

correct answer should be no.  Again, if there has been an occurrence and property damage, and

no exclusion applies, there should be coverage.").

     Gibbs M. Smith, Inc. v. U.S. Fidelity & Guaranty Co., 949 P.2d 337 (Utah 1997), also

supports this conclusion.  In that case, the Utah Supreme Court addressed the effect of a

contractual liability exclusion clause in a commercial general liability policy.  See id. at 340-341.

The court noted that the clause in question excluded coverage for liability assumed by the

insured under contract.  See id. at 341.  The court accepted the insurer's argument that the

exclusion applied only to indemnification and hold-harmless agreements and stated that if "the

provision does not apply to the insured's breaches of its own contracts, such breaches are not

excluded and coverage applies."  Id.  Gibbs M. Smith indicates that Utah has not adopted

wholesale the notion that commercial general liability polices confine the insurer's liability to

tort actions alone, but that Utah law looks to the substance of a particular claim not its form.  See

17

id. at 342 ("If the contract exclusion clause excluded all liability associated with a contract made

by the insured, commercial liability insurance would be severely limited in its coverage.").

The substance of the breach of warranty claim contained in the Yazd complaint is that the

plaintiffs are entitled to recover from Woodside as a result of the negligent construction of its

subcontractors.  Having already determined that faulty work performed by Woodside's

subcontractors can constitute an "occurrence" under the liability policy, it follows that the

allegations in the Yazd's complaint give rise to a duty to defend.

Great American also argues that the claims of mutual mistake and unilateral mistake

alleged in the Yazd complaint do not give rise to coverage or a duty to defend because only

equitable relief is available for those claims.  But "[o]nce an insurer has a duty to defend an

insured under one claim brought against the insured, the insurer must defend all claims brought

at the same time, even if some of the claims are not covered by the policy."  Overthrust

Constructors, Inc.. 676 F. Supp. at 1091.  Accordingly, the court need not address the merits of

Great American's assertion regarding the mistake claims pleaded in the Yazd complaint.

3.     *The Clark Action Contains Allegations that Could Trigger Coverage and Therefore the Duty to Defend Applies*

Although the complaint governing the Clark action does not expressly state any particular

cause of action, when viewed as a whole, the allegations in the complaint, if proven, could

trigger coverage under the policy.  The critical language in the Clark complaint appears in the

plaintiffs' prayer for relief.  Specifically, plaintiffs request that "[t]he Court find that the

Defendants have breached their written and verbal contracts and agreements with the Plaintiffs

and that the home is substandard or uninhabitable; therefore, the home needs to be replaced

and/or repaired in great detail."  (Amended Complaint 2-3, attached as Ex. 6 to Ison Aff.)  As

with the allegations in the Yazd complaint, the complaint governing the Clark action asserts that Woodside is liable to the plaintiffs for damage caused by the faulty work of Woodside's subcontractors.  Accordingly, for the reasons already discussed, insurance coverage may be implicated and the duty to defend applies.

**II. Liability of The Buckner Group**

Woodside and The Buckner Group have filed cross motions for summary judgment concerning potential liability of The Buckner Group to Woodside for failure to procure requested insurance coverage.[4]  Although the court concluded that Great American is not obligated to defend all of the underlying actions, The Buckner Group is nevertheless entitled to summary judgment.

The failure of an insurance broker to procure coverage that a potential insured represents to a broker as being essential can result in liability against the broker.  See Harris v. Albrecht, 2004 UT 13, ¶¶ 11-13, 86 P.3d 728.  But the undisputed facts in this case establish that The Buckner Group delivered an insurance policy to Woodside that met Woodside's expectations. Leonard Arave, the chief financial officer and vice president of Woodside, testified at his deposition as follows:

> Q.   And so after you got your policy from Great American, did you feel that you got in the policy what you and [The Buckner Group] had discussed getting?
>
> A.   Yes.
>
> Q.   And the only thing that's changed since then is the fact that Great

---

[4]The court notes that Woodside requested that its motion for summary judgment against The Buckner Group "be considered only if the Court denies Woodside's Motion for Partial Summary Judgment against . . . Great American[.]" (Memo. in Supp. of Woodside Homes Corp.'s Mot. for Part. Summ. J. Against The Buckner Group 1 (dkt. #143).)

American has apparently construed the policy in a manner different that and [The Buckner Group] intended?

A.   And I believe what the policy says, but yes, they have gotten very creative.

Q.   And I take it you understand [The Buckner Group] doesn't control the insurance company, obviously?

A.   No.  You know, I--again, I think [The Buckner Group] was honest and forthcoming and I--you know, I think we got--as far as [The Buckner Group] is concerned, what's there is there.  I think it's pretty obvious what's there is there. But no, I understand that.

. . . .

Q.   But the language you wanted was--[The Buckner Group] got you what language you wanted?

A.   As we looked at it and discussed things, and as I did my research and as I listened to [The Buckner Group's] recommendations, yes, we got what we wanted.

(Depo. of Leonard K. Arave, pp. 104-05, attached as Ex. G to Memo. in Supp. of The Buckner Group's Mot. for Summ. J. (dkt. #141-1).

Woodside desired a commercial general liability policy that included broad form property damage coverage that would provide Woodside coverage for faulty work performed by its subcontractors.  The policy that The Buckner Group secured for Woodside contained industry-standard language that the parties understood would provide that coverage.  As the court has already held, the policy does, in fact, provide coverage for the faulty work of subcontractors.  All the record evidence points in one direction: The Buckner Group used reasonable care in attempting to secure insurance coverage for Woodside and both The Buckner Group and Woodside were satisfied with the insurance policy they ultimately obtained from Great American.

To the extent Woodside claims that The Buckner Group was obligated to secure an insurance policy that provided Woodside coverage for its own, non-accidental acts--like those at

issue in the Parkinson action--Woodside's argument must be rejected.  Beyond the axiomatic fact that a commercial general liability policy is only applicable to accidental events, there is nothing in the record that indicates that Woodside expected insurance coverage that would insulate it from claims that it fraudulently concealed or misrepresented material facts to home buyers. Accordingly, The Buckner Group is entitled to summary judgment on Woodside's claims.

<u>**Conclusion**</u>

The complaints in the Clark action and the Yazd action seek recovery for damage caused by the faulty work of Woodside's subcontractors.  As discussed, those claims could trigger coverage under the insurance agreement between Great American and Woodside.  Because those actions implicate insurance coverage, Great American is not entitled to summary judgment on Woodside's claim that Great American breached the implied covenant of good faith and fair dealing.  But Great American is entitled to summary judgment that it has no obligation to defend or indemnify Woodside for the claims raised in the Parkinson action.

Further, because the undisputed facts establish that The Buckner Group procured the insurance coverage that Woodside requested, The Buckner Group is entitled to summary judgment on Woodside's claims against it.

Consistent with the foregoing analysis, the court orders as follows:

(1)   Third-Party Defendant The Buckner Group's Motion for Summary Judgment (dkt. #140) is GRANTED.

(2)   Defendant/Counter-Claimant/Third Party Plaintiff Woodside Homes Corporation's Motion for Partial Summary Judgment Against Third Party Defendant The Buckner Group (dkt. #142) is DENIED.

(3)   Defendant/Counter-Claimant/Third Party Plaintiff Woodside Homes Corporation's

Motion for Partial Summary Judgment Against Plaintiff/Counter-Defendant Great

American Insurance Company (dkt. #147) is GRANTED in part and DENIED in part.

(4)     Great American's Motion for Summary Judgment (dkt. #154) is GRANTED in part and

DENIED in part.

(5)     Motion to Strike or Disregard Inadmissible Evidence (dkt. #162) is DENIED as moot.


DATED this 28th day of August, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge